UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

CRIMINAL NO. 06-84-KKC

UNITED STATES OF AMERICA                                    PLAINTIFF


VS:                              REPORT AND RECOMMENDATION


TERRENCE TYRON SMITH                                        DEFENDANT

* * * * * * *

Defendant, Terrence Tyron Smith,  has moved to suppress evidence in this action (DE #33).
The grand jury indicted Smith on two counts alleging violations of 21 U.S.C. § 841(a)(1).
Specifically, the indictment charges Defendant with distribution of and/or possession with intent to
distribute five grams or more of crack cocaine.  Count Two results from alleged conduct on April
25, 2005 in Hazard, Kentucky.  Defendant moves to suppress the evidence–namely, a quantity of
crack seized by Kentucky State Police from Defendant on that date.

The Court received briefs from the parties and thereafter conducted an evidentiary hearing
on November 3, 2006.  At the hearing, the primary Kentucky State Police (KSP) Detective, Chris
Fugate, and primary KSP Trooper, Richard Miller, testified.  By agreement of the parties, the Court
also received telephonic testimony from witness Ronnie Campbell, who was involved in the events
of April 25, 2005.  The Court afforded the Defendant and the United States a full and fair
opportunity to present evidence, cross-examine witnesses, tender documents, and make argument.

The Court has considered the applicable suppression standards, burdens of production and
proof, and other procedural rules applicable in the suppression context.  The Court makes the
following recommended findings of fact and conclusions of law, premised on the hearing record:

RECOMMENDED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

1.      On March 22, 2005, KSP made a "controlled buy" of crack cocaine from Defendant in Lexington, Kentucky.   That buy involved both a KSP undercover agent and a cooperating confidential source (Source A).  Source A arranged and participated directly in the purchase from Defendant, which involved some 45 grams of crack.  That purchase forms the basis for Count One of the indictment.

2.      On or about April 25, 2005, the same Source A indicated to KSP that Defendant was "on the way to Hazard" with crack cocaine.  Source A got that information from a known dealer that, according to the testimony, frequently engaged in drug transactions with Defendant.  The police arranged for a second confidential source (Source B) to sit with KSP at the outskirts of Hazard and identify Defendant's automobile if and when Defendant arrived in Hazard.  Source B was the girlfriend of Source A and was familiar with Defendant, his alleged trafficking history, and his multiple vehicles.  Indeed, Source B also relayed the April 25 tip information provided by Source A.  Police treated Source A and B as "factual and believable" because those sources had effectively worked "about 250 drug cases" in the period around 2004-05.

3.      Source B did identify Defendant's vehicle as it entered the Hazard area.  By prior arrangement, KSP Trooper Miller, who operated a special K-9 unit, intercepted and followed Defendant's vehicle.  It is not disputed on the record that Defendant's vehicle failed to signal at a turn in Hazard.  Defendant admitted the failure to turn at the time.  Trooper Miller, purporting to rely solely on that failure to signal, pulled the vehicle over at approximately 1:00 p.m. on April 25, 2005.

4.      The Court finds that the initial stop of Defendant's vehicle was legitimate and proper.  Defense counsel attempts to suggest that, since the vehicle turned left from a designated turn lane

where the road at issue ended, failure to signal was not illegal.  However, KRS § 189.380 is categorical and forbids a person to "turn a vehicle. . . upon a roadway. . . without giving an appropriate signal[.]" Here, Trooper Miller testified without contradiction that Defendant operated the vehicle and did not appropriately signal.  Trooper Miller further testifies that the turn Defendant performed required a signal.   Miller had probable cause to stop the vehicle, based on the apparent traffic violation. *See Whren v. United States,* 116 S. Ct. 1769, 1772 (1996)(holding that probable cause to believe traffic violation occurred provides reasonable basis for stop).

5.      Certainly, Trooper Miller's presence on the scene, with K-9 accompaniment, was pre-arranged in anticipation of a drug investigation.  Because probable cause supported the traffic stop, the fact that the stop conveniently furthered the "real" purpose of law enforcement that day, *i.e.*, a drug investigation, is not material.  The stop was valid.  *See id.* at 1773.

6.      Defendant drove the vehicle at issue, which also carried a passenger, Ronnie Campbell.  At the time of the stop, Trooper Miller knew about the tip from Source A, knew about (and had personally participated in) the March controlled buy from Defendant, and knew that Source B had identified Defendant's car.  Trooper Miller had reasonable grounds for making a *Terry*-type inquiry regarding whether Defendant and his passenger were involved in illegal drug-related conduct.

7.      Trooper Miller immediately spoke to the vehicle occupants.  He noticed right away that Defendant's fly was unzipped and that Defendant kept "tugging and pulling" at his crotch area. Miller requested permission to search the vehicle, and Defendant immediately granted consent. Thereafter, Defendant walked his K-9 around the exterior of the vehicle, but the dog did not "alert."

8.      Miller testified that his K-9, Balco, was trained to "actively" alert in the presence of

drugs hidden in inanimate objects. Balco alerted by biting and scratching where drugs were kept or hidden. Miller clearly testified that Balco was not trained to and "wouldn't alert on a person" possessing drugs, because Balco was an "active" not "passive" alert dog. Balco's training did not provide for him to actively alert–which necessarily involves biting and scratching–on a human subject.

9. After Miller secured consent to search, but before he searched the vehicle, Miller conferred separately with the Defendant and passenger. Trooper Miller was waiting for other officers to arrive before commencing the search. Miller, outside Defendant's hearing, asked the passenger, Ronnie Campbell, "if there was dope in the car." Campbell informed Miller[1] "the dope was on the defendant's person," that "the defendant had it on him." Det. Fugate recalled Miller relaying that Campbell had said Defendant carried the drugs hidden in his *crotch* area.

10. Miller then walked Balco "around" Defendant. Balco's "demeanor" changed when he stuck his snout in Defendant's crotch area. Trooper Miller said that although Balco would not alert to a human possessing drugs, Balco still "became excited," suggesting to Miller that Balco had

---

[1]

The Court recognizes a testimonial conflict on this key issue. Miller testified that Campbell expressly told him Defendant personally possessed drugs. Campbell, who testified at the hearing by telephone, expressly denied making the statement. The Court credits Miller's version. Campbell, a convicted felon, obviously was under significant personal pressure regarding his testimony. He would not even appear and testify in person. Though Campbell claimed a physical inability to attend the hearing, the Court notes that Campbell regularly goes "fishing" and had made at least one recent trip as far as Hazard, for the stated purpose of scouting fishing locations. Campbell's telephonic testimony was not credible.

sensed drugs hidden around Defendant's crotch.  This behavior by Balco confirmed to Miller that the passenger's information about the drugs was truthful and accurate.

11.     Trooper Miller then ran Balco through the vehicle.  Balco did not "alert" inside the vehicle, showing only a change of demeanor at the driver's bucket seat.  This was not a full alert, and police found no drugs in the vehicle.

12.     Passenger Campbell did consent to a search and dropped his pants to allow police to check whether Campbell had secreted drugs on his person.  Defendant refused to consent to a search of his person and specifically would not drop his pants to permit Miller to check for hidden drugs.

13.     Miller testified credibly that he tried to protect Campbell's information, which obviously inculpated Defendant, from disclosure to Defendant.  Per Campbell's request, Miller did not disclose the tip to Defendant, and Miller attempted to make Campbell "look good" to Defendant by searching Campbell, running Balco through a full search of the vehicle, and acting as if Campbell had not cooperated.

14.     By about 1:30 p.m. on April 25, 2005, Trooper Miller and the KSP possessed the following information:

    a.     They knew about the March 22, 2005 crack purchase, involving Source A.

    b.     They knew about the April 25, 2005 tip from Sources A and B, and the identification of Defendant in Hazard by Source B.

    c.     KSP knew that Source A and Source B had a long track record of reliability.

    d.     Defendant actually had driven from Lexington to Hazard, as Source A's information indicated.

e.    Defendant had acted suspiciously after the stop, insofar as his pants were mysteriously unzipped, and Defendant kept tugging and pulling at his crotch.

f.    They knew that drug traffickers commonly hide contraband in the crotch area, believing such a location less likely to be searched.

f.    Passenger Campbell expressly had informed Miller that Defendant had drugs not in the car but on Defendant's person, hidden around Defendant's crotch.

g.    Miller had confirmed that no drugs were in the car, and Miller's dog had become "excited" or had a "demeanor" change when sniffing the area of Defendant's crotch. Balco had a similar demeanor change sniffing the bucket seat Defendant had just occupied as driver of the subject vehicle.[2]

15.    Defendant makes much of the failure of Balco to alert, and argues a dissipating effect on probable cause or reasonable suspicion. In truth, based on the testimony of record, Balco acted exactly as Miller testified he should. As an "active" alert dog, Balco would not alert on a person, only on, *e.g.*, a vehicle. Balco did not alert in the vehicle because no drugs were in the vehicle.

---

[2]

A drug dog's mere "interest" in an item does not constitute probable cause for a search. *See United States v. Guzman*, 75 F.3d 1090, 1096 (6th Cir. 1996). However, a court may consider an officer's awareness of the dog's interest in determining whether the totality of the circumstances establishes probable cause. *See id.* (upholding a finding of probable cause based, in part, on a drug dog's "interest" in defendant); *see also United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)(noting that a drug dog's "interest" in a package may support a reasonable suspicion); *United States v. Sullivan*, 625 F.2d 9, 13 (4th Cir. 1980)(finding that, although the drug dog did not show a "full alert," the response by the dog to defendant's luggage, when coupled with other facts, provided probable cause to issue a search warrant for the baggage).

Consequently, in light of a drug dog's "interest" in an item, the failure of a drug dog to positively alert does not dispel an officer's suspicions. *See Guzman*, 75 F.3d at 1096. Indeed, the complete failure of a drug dog to detect the presence of drugs does not necessarily destroy probable cause where authorities have ample evidence, independent of the canine search, sufficient to establish probable cause. *See United States v. Vidal*, 1988 WL 24216, at *2 (6th Cir. 1998). Balco's conduct plainly is a relevant factor.

Balco did not alert on Defendant because Defendant is a person, a search scenario outside Balco's training. Balco's changed demeanor was the dog's only indication of drugs, and that indication partially corroborated passenger Campbell's information.

16.     Trooper Miller's actions between the 1:00 p.m. initial stop and 1:30 to 1:45 p.m., the approximate time Miller first contacted Det. Fugate, were reasonable in scope and duration. Miller promptly followed investigative steps supported by reasonable suspicion. Upon determining that Defendant would not consent to a search of his person, Miller contacted Fugate, who determined to secure a search warrant.

17.     Fugate returned to the KSP Post to complete a warrant application and then presented that application to a state District Judge at 3:01 p.m. The judge, it appears, promptly issued the warrant. During the time Fugate pursued the warrant, Miller decided to transport Defendant and Campbell to the KSP Post. At some point prior to transporting Defendant, Miller placed handcuffs on Defendant and placed Defendant in a police cruiser.

18.     Subjectively, Miller testified that he did not, at any time, arrest Defendant. He testified that he transported Defendant to the KSP Post for the anticipated search, and he handcuffed Defendant to prevent possible spoliation of evidence. According to Trooper Miller's descriptions, Defendant was handcuffed and at the KSP Post for at least 1.5 hours before the search occurred. Miller testified that he cuffed and transported Defendant when he knew Det. Fugate was going to pursue the search warrant. The evidence indicates that occurred around 1:30 p.m., and the search could not have occurred until shortly after 3:01 p.m., when the state judge issued the warrant.

19.    Det. Fugate, in charge of pursuing the state search warrant, finished and presented a warrant application to the Perry District Court.  Based on the information developed and gathered by the authorities, *see* ¶14 above, a properly-completed warrant application easily would have supplied probable cause for the search of Defendant.  Unfortunately, the Court finds that the actual application presented to the state court failed to present probable cause.

20.    The Court must limit its review of the warrant to the materials submitted to the issuing judicial officer.  A state search warrant being challenged and reviewed in federal court must satisfy federal constitutional standards.  *United States v. McManus*, 719 F.2d 1395, 1397 (6th Cir. 1983); *United States v. Elliott*, 576 F. Supp. 1579, 1580 (D.C. Ohio, 1984).  Furthermore, judicial review of the warrant is limited to the four corners of the application and affidavit.  *United States v. Smith*, 783 F.2d 648, 654 (6th Cir. 1986); *Elliott*, 576 F. Supp. at 1580.

21.    The United States characterizes the warrant application as "thin" but valid.  The Court finds that the warrant is too thin to demonstrate probable cause.  The entire factual basis for the warrant is the following:

> Affiant has been an officer in the aforementioned agency for a period of 10 years and the information and observations contained herein were received and made in his capacity as an officer thereof.

> On the 25 day of April, 2005, at approximately 0800 a.m., affiant received information from: A KSP cooperating witness who stated they received information that Terrence T. Smith was traveling to Hazard Kentucky on the same with with [sic] at least one ounce of "Crack" Cocaine.

> Acting on the information received, affiant conducted the following independent investigation: On 03-22-05, units from the Hazard HIDTA Drug Task Force, purchased two ounces of "Crack" Cocaine From Terrence T. Smith using a cooperating witness.  Terrence T. Smith has (2) drug related arrest [sic].

This basis fails to establish probable cause.  Probable cause exists where the facts and circumstances presented are sufficient to warrant a person of reasonable prudence in the belief that contraband or evidence of a crime will be found.  *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

First, nothing in the affidavit purports to reference, much less effectively establishes, the reliability of the "cooperating witness."  Certainly, knowing all that the KSP *could* have put in the warrant, Source A was reliable.  Knowledge outside the four corners of the affidavit, relative to the veracity of an unnamed informant, cannot supply probable cause.  The application is devoid of further information about the source of the April tip.  The affidavit simply indicates that a "KSP cooperating witness . . . received information" that Defendant was coming to Hazard with drugs.  This does not indicate how, when, or from whom the cooperating witness learned this information, and the affidavit does not give any other circumstances that might fairly establish credibility with respect to the tip.

Second, reference to the March 22 drug buy does not suffice, for probable cause purposes, in this context.  The affidavit confusingly suggests that the affiant "acting on" the April 25 tip, conducted an investigation that included the March 22 drug buy.  This temporal impossibility, perhaps owing to the use of boilerplate language or drafting oversight, can be excused; however, the affidavit critically fails to otherwise link the March and April events.  Indeed, the affidavit omits the key fact tying the March conduct to the April warrant basis by **failing to state that the cooperating witness on the March 22 buy was the same person as the cooperating witness that provided the April 25 tip**.   Thus, the reviewing judge knows only that someone (with no established reliability or credibility) heard from someone (with no established reliability or

credibility) that Defendant was traveling to Hazard with crack, and that some cooperating witness had purchased crack from Defendant a month earlier.    The truth is that Source A bought from Defendant in March **and** supplied the April tip, after hearing directly from a known customer of Defendant's that Defendant was "on the way" to Hazard.  The affidavit wholly fails to convey this critical background.

Notably, the affidavit also did not inform the state court a) that Defendant had, in fact, appeared and been positively identified in Hazard on April 25; or b) about any of the conduct or activity–such as Defendant's suspicious behavior (regarding the zipper and crotch-tugging) or, critically, the statement by passenger Campbell–resulting from the stop by Trooper Miller.

The affidavit concludes, "[Defendant] has (2) two drug related arrest [sic]." The affidavit does not identify or hint at the location, exact nature, or temporal proximity of these arrests.

The warrant application also extends to, but provides no basis for, searching the vehicle referenced.  Nothing in the affidavit ties the vehicle to the events in question.  Further, the warrant application does not indicate Defendant's location at the time of the application and does not reference the results of the K-9 search, results that surely would have impacted the state court's consideration of the scope of the warrant, at least as to the vehicle.

22.    Police secured the warrant and then executed it on Defendant at the KSP post.  That search yielded the crack forming the basis for Count 2 of the indictment, which police discovered in a sock hidden in Defendant's underwear.  Because the warrant issued on less than probable cause, the Court cannot uphold the search based on the strength of the warrant itself.  This leads the Court to consider the *Leon* good faith exception.

24.     In *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court held the Fourth Amendment exclusionary rule will not bar evidence seized in reasonable, good faith reliance on a search warrant subsequently determined to be invalid. *See Leon*, 468 U.S. at 905; *United States v. Leake*, 998 F.2d 1359, 1366 (6th Cir. 1993).

The Court believes and finds that the police actually did act in good faith in pursuing this matter. Both Trooper Miller and Det. Fugate repeatedly showed caution in proceeding with the stop, investigation, and ultimate search. For instance, Miller waited to stop Defendant until probable cause for a traffic stop appeared. A more aggressive approach would have been to stop Defendant immediately upon his entry into Hazard. Miller also employed his K-9 and dealt with the stop subjects in a manner indicating good investigative control. Additionally, Fugate's decision to suspend the investigation pending application for and issuance of a warrant is the very type of restrained conduct that should be encouraged by courts in applying the exclusionary rule and constitutional search principles. The warrant application's failure to convey probable cause does not defeat good faith, particularly given the abundance of cause police actually possessed at the time.

The Supreme Court identified four specific situations where the *Leon* "good faith" exception to the exclusionary rule does not apply:

1) where the supporting affidavit contained a knowing or reckless falsity;

2) where the issuing magistrate failed to act in a neutral and detached fashion, and served merely as a rubber stamp for the police;

3) where the supporting affidavit did not provide the magistrate with a substantial basis for determining the existence of probable cause, or in other words, the warrant application was supported by nothing more than a "bare bones" affidavit; and

4) where the officer's reliance on the warrant was neither in good faith nor objectively reasonable. *Id.*

After reviewing the record, the Court finds that none of these situations precludes the application of the "good faith" exception to this case.

First, there are no allegations that the supporting affidavit contained knowing or reckless falsity. Although police may have omitted material facts from the affidavit (*e.g.*, failing to explain that a drug-detecting canine did not alert following two separate searches of Defendant's vehicle), the Court does not find that authorities knowingly or recklessly misled the state judicial officer, particularly since the omission would not impact the warrant as to a search of Defendant's person. Similarly, Defendant presented no argument or evidence to suggest the state judge failed to perform the probable cause determination in a neutral and detached manner. Det. Fugate testified to a full review by the state judge. Thus, neither of the first two situations applies in this case.

The third *Leon* exception applies if the supporting affidavit does not provide the judicial officer with a "substantial basis" to determine the existence of probable cause. This standard is, by definition, below the probable cause threshold. Excluded "bare bones" affidavits contain only suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge. *See United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005). Although the supporting affidavit in this case is dangerously thin, it is not a bare conclusion or statement by the affiant that he believes probable cause exists. *See United States v. Williams*, 224 F.3d 530, 533 (6th Cir. 2000).

Instead of being "bare bones," the affidavit states that a cooperating witness has identified the date and place of a suspected drug transaction involving Defendant. The cooperating witness

also related the type and amount of drugs involved.  In addition, the affiant-investigator attempts to corroborate the witness's information with reference to Defendant's two drug-related arrests and a very recent "controlled purchase" between Defendant and state authorities that featured the identical unlawful conduct (a crack transaction) cited in the tip.  Although limited, the facts and supporting corroboration go beyond a mere conclusion by the affiant that probable cause exists.  *See Williams*, 224 F.3d at 533.

Lastly, the Court finds that state police reasonably, and in good faith, relied on the search warrant in this case.  Regarding the good faith analysis, the relevant test is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  *Leon*, 468 U.S. at 922 n.23.  Good faith does not exist where an affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  *United States v. May*, 399 F.3d 817, 826 (6th Cir. 2005)(citations omitted).

The supporting affidavit in this case primarily relies on the information provided by a cooperating witness.  Although the affidavit did not name or identify the informant, his status as a "cooperating witness" suggests police knew and had worked with the source.  A person known to the affiant-officer, though not named in the affidavit, is not an "anonymous informant", and such person's statements are entitled to greater weight than an anonymous source.  *See May*, 399 F.3d at 824-25.  In addition, the affidavit provided some corroboration by noting Defendant's previous illegal drug activity, both the recent transaction and the arrests.

Although a tip by an unnamed, but cooperating, witness  that is weakly corroborated by Defendant's criminal history falls short of establishing probable cause, the police were not unreasonable in relying on the warrant once issued by the state judge.  The Fourth Circuit reached

a similar conclusion in *United States v. Bynum*, 293 F.3d 192, 196 (4th Cir. 2002). In *Bynum*, a confidential informant, known to police, advised authorities that the defendant had a large quantity of heroin at his residence. The affidavit corroborated this information by providing that the defendant was a convicted felon and that a recent search of defendant's residence had resulted in the seizure of drug paraphernalia. Although the Court assumed that probable cause did not exist, the Fourth Circuit held that the tip and the suspect's corroborating criminal history were not so lacking in probable cause as to render reliance on the warrant totally unreasonable. *See id*. at 200. Similarly in this case, a witness known to police advised authorities that Defendant would be selling a specified amount of crack cocaine in Hazard, Kentucky on April 25, 2005. In the affidavit, police corroborated this information by explaining that Defendant had two drug-related arrests and was the subject of a "controlled purchase" barely 30 days prior to the tip. Thus, there is sufficient indicia of probable cause in the affidavit to make the reliance of authorities reasonable for *Leon* purposes. *See May*, 399 F.3d at 826.

Both the Fourth and Sixth Circuits recognize that authorities may use a suspect's criminal history or evidence of prior unlawful activity to corroborate information provided by informants. *See Bynum*, 293 F.3d at 197-98; *United States v. Weaver*, 99 F.3d 1372, 1380-81 (6th Cir. 1996)(recognizing that a suspect's prior unlawful activity or related convictions can corroborate information supplied by informants). By attempting to corroborate the cooperating witness's information in a manner sanctioned by the Sixth Circuit, the Court finds the state police acted reasonably and in good faith, even though the Court ultimately concludes the affidavit failed to establish probable cause. *Leon* thus validates the search.

25.  Finally, the Court must deal with the issue of Defendant's extended detention on April 25, 2005.  Although there is no bright line that distinguishes a stop from an arrest, the Sixth Circuit has identified some general factors "[t]o determine whether an investigative detention has crossed the line and become an arrest."  *United States v. Lopez-Arias*, 344 F.3d 623, 627 (6th Cir. 2003). These factors include "the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force."  *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991).  Other considerations may involve the passage of time, the conduct of the police, the characteristics of the particular defendant, and the physical surroundings of the encounter.  *Id*.

In applying these factors, the Sixth Circuit has specifically determined that the use of handcuffs does not necessarily exceed the bounds of a *Terry* stop where the circumstances warrant that precaution.  *See Houston v. Clark County Sheriff Dept.*, 174 F.3d 809, 815 (6th Cir. 1999). Likewise, detaining the subject in a police cruiser does not automatically transform a *Terry* stop into an arrest.  *Id*.  Although the Sixth Circuit held in *Richardson* that detaining a motorist in the squad car to separate and individually interrogate the motorist and his passenger constituted an arrest, this decision has been distinguished.  *See United States v. Caruthers*, 458 F.3d 459, 469 (6th Cir. 2006)(finding no arrest where defendants were placed in a patrol car while police searched for weapons because defendants were not subjected to police interrogation while confined in the patrol car); *United States v. Jacob*, 377 F.3d 573, 580 (6th Cir. 2004)(holding it was not unreasonable for police to handcuff and place defendants in the patrol car because defendants had attempted to flee when investigators initiated the stop, the police needed to secure and control the scene of the stop

environment, and police did not use the confinement to question the defendants); *United States v. Hood*, 1992 WL 322373, at *4 (6th Cir. 1992)(finding no arrest where defendants were placed in the back of a locked patrol car where the defendants were not handcuffed, were not confined in the patrol cars for the purposes of interrogation, the stop did not involve multiple patrol cars or officers, and the stop did not last any longer than necessary to effectuate the purpose of the stop).

Unlike most of the factors identified by the Sixth Circuit, however, *transporting* a person from the site of the initial stop is highly indicative of an arrest. The removal of a suspect from the scene of a stop generally marks the point of arrest, the point at which the Fourth Amendment demands probable cause. *See Centanni v. Eight Unknown Officers*, 15 F.3d 587, 591 (6th Cir. 1994). Absent that probable cause, an investigate stop must be confined to the site of the initial inquiry. *United States v. Heath*, 259 F.3d 522, 531 (6th Cir. 2001). Police cross the arrest line when they forcibly remove a person from a place at which he is entitled to be and transport him to the police station where he is detained, however briefly, for investigative purposes. *See United States v. Obasa*, 15 F.3d 603, 608 (6th Cir. 1994).

Here, the combination of relevant factors forces the Court to find that authorities in fact arrested Defendant prior to the subject search. The acts of separating Defendant and the passenger for investigative purposes, placing Defendant in an open cruiser, and even temporarily handcuffing Defendant would not necessarily establish that an arrest occurred. However, in this circumstance, police then transported Defendant to the police station and held him, in handcuffs, for at least 1.5 hours while waiting for the search warrant. This extensive interference with Defendant's liberty rises to the level of arrest. Particularly because the content of the search warrant application contained only information that police had already possessed for 5 hours in advance of the traffic

stop, the United States cannot rationally classify the detention as needed to protect evidence pending completion of the warrant process.

Although the Court finds that an arrest occurred, the Court also finds that probable cause existed to support that arrest.  The factors recited in ¶ 14 collectively meet the probable cause standard with ease, demonstrating that the facts and circumstances known to the authorities would warrant a prudent person in believing that an offense has been committed.  *See Henry v. United States*, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).   Because the police had probable cause to arrest Defendant prior to the act of transporting Defendant to the KSP post, the Court finds that the arrest was appropriate, albeit unwitting.[3]   Probable cause validates the scope of the detention. *See United States v. Sturgis*, 238 F.3d 956, 959 (8th Cir. 2001)(upholding 2 hour detention pending canine search because "agents had probable cause to seize [defendant]. . . It is immaterial that the agents didn't formally arrest [defendant] while they waited for the canine unit.").

26.     This probable cause finding also supplies an alternative basis, in addition to *Leon*, for validating the search that yielded the evidence addressed by Defendant's motion.  Since police did in fact arrest Defendant, and since police did have probable cause for that arrest, the resulting search would have been legitimate as a search incident to arrest under well-established Fourth Amendment law.  *See, e.g., Michigan v. DeFillippo*, 443 U.S. 31 (1979); *United States v. Coleman*, 458 F.3d 453, 458 (6th Cir. 2006).  Given the authorities' clear grounds for arrest and highly-particularized information indicating that Defendant hid contraband in his crotch area, a search incident to arrest that extended to Defendant's groin area would have been a reasonable and justified

---

[3]

Trooper Miller, though subjectively denying that arrest occurred, did testify that he believed he possessed "probable cause to detain this individual [*i.e.*, Defendant]."

intrusion.

RECOMMENDATION

For all of the reasons stated, the Court recommends that the District Court deny the Motion to Suppress filed by Defendant.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of said statute.  As defined by § 636(b)(1) and local rule, within ten days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, de novo, by the District Court.

This the 9th day of November, 2006.

Signed By:

*Robert E. Wier*

United States Magistrate Judge